Elizabeth M. Locke, P.C. (*Pro Hac Vice*
Application Forthcoming), VA Bar No. 71784
CLARE LOCKE LLP
10 Prince Street
Alexandria, VA 22314
Telephone: (202) 628-7400
Email:  libby@clarelocke.com

Michael B. McClellan, CBN 241570
NEWMEYER & DILLION LLP
895 Dove Street, Fifth Floor
Newport Beach, CA  92660
Telephone: (949) 854-7000
Email:  Michael.McClellan@ndlf.com

*Attorneys for Plaintiff CoreCivic, Inc.*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CORECIVIC, INC., | CIVIL ACTION NO: 2:20-CV-02128 |
| Plaintiff, | **COMPLAINT FOR:** |
| v. | **1. DEFAMATION** |
| CANDIDE GROUP, LLC and | **2. DEFAMATION BY IMPLICATION** |
| MORGAN SIMON, | |
| Defendants. | |

1.      This defamation action arises out of Candide Group LLC's and Morgan Simon's ("Defendants") campaign to promote two demonstrable falsehoods for the purpose of driving capital away from CoreCivic, Inc. and toward the investment products Defendants profit from.

2.       ***First***, although ***CoreCivic does not and has never operated immigrant detention facilities for children separated from their parents at the border—and although those facilities are operated by the government or by other companies[1]***—Defendants have deliberately led the public to believe otherwise, exploiting the Families Belong Together movement and misdirecting public outrage over the Trump Administration's family separation policy for their own financial gain.

3.       ***Second***, although ***CoreCivic does not lobby for harsher sentencing or immigration laws***, Defendants have recklessly and repeatedly promoted the myth that the company lobbies to incarcerate as many people as possible for as long as possible.

4.       Defendants promoted these falsehoods in numerous posts and marketing pieces on Forbes.com, on social media, and elsewhere.  Defendants did so with actual malice, disregarding their first-hand knowledge, intentionally disregarding numerous publicly available sources rebutting their false claims, purposefully avoiding contacting CoreCivic for comment before publication, and—when specifically put on notice of the truth and asked to retract—doubling down on and republishing their false accusations, all in furtherance of a plan to financially enrich themselves at CoreCivic's expense.

5.       Defendants' falsehoods have had their intended effect and have caused CoreCivic financial and reputational harm, prompting the public to shun and avoid the company and driving up the cost of capital for the company.

6.       CoreCivic brings this action to set the record straight, to vindicate the company's rights under civil law, to recover compensatory and punitive damages for the harm Defendants have caused, and to stand up for the thousands of

---

[1] All bold and italic emphases added unless otherwise noted.  All underlining in original unless otherwise noted.

people who work at CoreCivic.

## PARTIES

7.      Plaintiff CoreCivic, Inc. provides a broad range of services designed to help local, state, and federal governments meet their respective needs in a cost-effective manner.  These services include managing correction and detention facilities, providing real estate solutions, and maintaining reentry centers. CoreCivic is an industry leader that has lobbied in favor of criminal justice reforms to reduce recidivism and incarceration rates by helping people more successfully reenter society upon their release.  The company is headquartered in Tennessee and incorporated in Maryland.

8.      The Candide Group, LLC ("Candide") is a for-profit California State Registered Investment Advisor with $40 million of client assets under management that is focused on convincing high-net worth individuals and companies to redirect their capital to the investment products the company profits from promoting.  Candide is a domestic California company and is headquartered in Alameda County, California.  Upon information and belief, Candide has two members: Morgan Simon and Aner Ben-Ami, a resident of Oakland, California who is domiciled in California.

9.      Morgan Simon is a financial advisor and a founding partner and 50% owner of Candide.  At all times relevant to this Complaint, Simon was speaking on behalf of both herself and Candide.  On information and belief, Simon is a United States Citizen who resides in Los Angeles County and is domiciled in California.

## JURISDICTION AND VENUE

10.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the parties are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

11.      This Court has personal jurisdiction over Defendants pursuant to

California's long-arm statute, Cal. C.C.P.§ 410.10, which extends jurisdiction to the full extent permissible under the Due Process Clause of the United States Constitution, because (1) Candide is a domestic California company and is headquartered in California; (2) Simon is a resident of and is domiciled in California; (3) Defendants do business in California; and (4) Defendants published the statements giving rise to this action in California.

12.     Venue is proper under 28 U.S.C. § 1391 (b) and (c) because a substantial portion of the events or omissions giving rise to this action occurred in this judicial district, because Simon is a resident of this judicial district, and because Candide is a resident of California.

**FACTS**

13.     Defendant Simon is a registered investment advisor in California and has worked in the financial industry for nearly two decades.[2]

14.     In order to differentiate herself from a flooded field of for-profit investment advisors, Simon claims that she has redefined and revolutionized the archetypal "investor" or venture capitalist in their "ivory tower of three-piece suits, board rooms, and bank vaults," by promoting "socially conscious" investments.  *Id*.

15.     Simon boasts that she has "personally influenced over $150 billion in funds since 2001."  *Id*.  Simon claims she is able to distill "a practice previously reserved for Wall Street into a language spoken on every main street in the world."  *Id*.

16.     In 2013, Simon co-founded and became a 50% owner of Defendant Candide, a for-profit financial investment firm.[3]

17.     Candide differentiates itself in the investment firm industry by

---

[2] Morgan Simon, http://morgansimon.com/morgans-bio.

[3] Candide Group, https://candidegroup.com/.

attempting to convince investors, institutions, and banks to divest from companies like CoreCivic and to invest in the investment products Candide sells. *Id*.

18.     While Candide focuses on private investments, it also actively partners with other financial managers to "build diverse, impactful portfolios across asset classes," and "has supported over 65 investments in companies and funds," including private equity and venture funds and real estate funds.[4]

19.     Defendants profit by identifying companies and investment funds for their clients, in exchange for either a fixed fee or fixed percentage of the client's investment in the funds or companies they select.

20.     Defendants currently have $40 million of client assets under management. Defendants charge their clients approximately $420,000-500,000 annually if they choose a fixed fee structure.[5] And clients choosing to invest through an Investment Management fee structure are charged a percentage of their invested assets, as follows:[6]

| Assets Under Advisement | Annual Advisory Fee |
| --- | --- |
| 0 to $4,999,999 | 1.75% |
| $5,000,000 to $9,999,999 | 1.5% |
| $10,000,000 and above | 1.25% |

21.     Defendants encourage clients and potential clients to invest in the companies and funds they support and partner with. *Id.*

22.     The more capital Defendants redirect from companies like CoreCivic into the investment products Defendants offer, the more money Defendants make.

---

[4] Candide Group, *Our Portfolio*, https://candidegroup.com/portfolio.

[5] Candide Group ADV II.

[6] *Id*.

23.     Simon also sought to expand her and Candide's public profiles in the financial industry by publishing a book entitled "Real Impact: The Economics of Social Change."[7]  Simon also makes money and profits from sales of her book.

24.     To further expand their public profile and client base, Defendants have published marketing pieces on the Forbes.com platform and exploited the Forbes brand to promote themselves and Simon's book.  In her Forbes biography, Simon describes herself as an "investor" first.  Defendants recklessly and intentionally publish false statements in marketing pieces on Forbes.com, with the intent to redirect capital from companies like CoreCivic and into the companies and investment funds from which Defendants profit.

25.     While these marketing pieces identify Simon as the author, the pieces are written on behalf of both Defendants.  This is not only evident from the language within the text of these pieces, but through Candide's "Full Disclosure" which is hyperlinked on the bottom of each post.[8]  This Candide Disclosure confirms that "the information and opinions stated [within the post] reflect Candide Group's views as of the time of publication."  *Id.*

**The Trump Administration's Family Separation Policy Ignites A Movement**

26.     On the campaign trail in 2015-2016, then-candidate Donald Trump made immigration a centerpiece of his campaign, offering a more hard-lined approach to immigration policy than previous administrations and his opponents.

---

[7] Morgan Simon, *Real Impact: The New Economics of Social Change* (2017), *available at,* https://www.amazon.com/Real-Impact-Economics-Social-Change/dp/1568589808/ref=sr_1_2?crid=30LJ9M0P9OK4&keywords=real+impact+the+new+economics+of+social+change&qid=1572395052&sprefix=real+impact,aps,133&sr=8-2.

[8] Candide Group Disclosures 3, *available at,* https://docs.google.com/document/d/1HdOh3uInhXvBzHUWKPVWoF8C9ACfH8PDcXFb0D_GZdo/edit.

He launched his campaign with a speech alleging Mexico was "sending people that have a lot of problems, and they're bringing those problems with us.  They're bringing drugs.  They're bringing crime.  They're rapists."  Trump's rhetoric on immigration drew ire from many Americans, who became concerned that his stance on immigration over the southern border would lead to inhumane policies meant to deter illegal border crossings.

27.     After President Trump took office, many Americans were on high alert about immigration policies his administration would initiate to deter immigration at the southern border.

28.     In early 2017, government watchdogs and news outlets began reporting that the Trump Administration was considering separating **all** undocumented children from their families if they crossed the southern border, as a deterrent against border crossings.

29.     On March 7, 2017, John Kelly, then Secretary of State, confirmed the fears of many by admitting that the Trump Administration was in fact considering such a policy.

30.     Under previous administrations, border-crossers were only occasionally prosecuted and separated from their families, and children were only separated from their parents when authorities had concerns for their well-being or could not confirm that an adult was in fact a child's legal guardian.

31.     In the summer of 2018—in response to families of asylum seekers fleeing violence in Central America—Jeff Sessions announced that the Trump Administration had enacted a "zero tolerance" policy at the southern border and the Departments of Justice and Homeland Security would partner together to prosecute everyone who crossed the border illegally and, in doing so, would separate all children who crossed the border with their parents.

32.     Sessions issued a warning to parents who contemplated a border crossing, stating: "If you are smuggling a child, then we will prosecute you and that

child will be separated from you as required by law.  If you don't like that, then don't smuggle children over our border."

33.    Over a six-week period, between April 19 and May 31, 2018, the Administration reported that nearly 2,000 children were separated from their families as part of the zero-tolerance initiative.

34.    Because of the large number of children being separated from their families at the border, the Trump Administration did not place them in foster homes as previous administrations had done and, instead, placed separated children in immigration detention centers.

35.    The Trump Administration's family separation policy sparked international condemnation, as people from all walks of life and political leanings became heartbroken and outraged over photographs and accounts of children separated from their parents and locked up in a metal cage with bed pads and mylar blankets at the U.S. Border Patrol facilities in Clint, Texas and McAllen, Texas:




36.    Public outrage galvanized a movement against the Trump Administration's family separation policy—the likes of which had never been seen before.  Tens of thousands of citizens in all 50 states and numerous non-profit

organizations opposed the family separation policy under the banner and hashtag "#FamiliesBelongTogether," and participated in rallies and protests across the country.

37.     Religious and political leaders demanded that the administration stop separating children from their families and locking them up in detention centers.

38.     Six hundred Methodists filed a formal complaint against Jeff Sessions for his involvement in the family separation policy, charging him with child abuse, immorality, racial discrimination, and "dissemination of doctrines contrary to the standards of doctrine of the United Methodist Church."

39.     Protestors and elected officials camped outside of detention facilities to bring awareness to the plight of the children and demand that the Administration put a stop to the family separation policy.

40.     In June 2019, a video of a U.S. Attorney's oral argument before the United States Court of Appeals for the Ninth Circuit went viral and drew renewed condemnation of the family separation policy and the Trump Administration's argument that it was not required to provide soap, toothbrushes, or beds to detained migrant children separated from their parents.

41.     That same month, reports began to emerge from immigration attorneys alleging hundreds of migrant children separated from their parents were being held in harsh conditions at the U.S. Customs and Border Protection's station in Clint, Texas.  Lawyers warned that "kids are taking care of kids, and there's inadequate food, water and sanitation for the 250 infants, children and teens" at certain detention facilities.

**CoreCivic Has Never Operated Any Of The Facilities That House Children Separated From Their Families Pursuant To The Trump Administration's Family Separation Policy**

42.     CoreCivic does not, nor has it ever, operated any immigration

detention facilities for children separated from their parents pursuant to the government's family separation policy.[9]

43.     CoreCivic does not operate and has never operated the U.S. Customs and Border Protection stations in Clint, Texas or in McAllen, Texas—the facilities that galvanized the Families Belong Together movement in response to the Trump Administration's family separation policy.

44.     The immigration detention facilities that house children separated from their parents at the border are either run by the government or by other companies.

45.     CoreCivic does not operate any border patrol facilities.

**Defendants Exploit the Families Belong Together Movement For Their Own Financial Gain**

46.     Defendants saw an opportunity to exploit the Families Belong Together movement for their own financial gain: they could promote Candide's for-profit investment offerings by misdirecting public outrage—***and thereby redirecting capital***—over something CoreCivic does not do and has never done: namely, operating immigrant detention facilities for children separated from their parents pursuant to the government's family separation policy.

47.     Beginning in September 2018, Defendants repeatedly targeted CoreCivic and The GEO Group, Inc. ("GEO Group") with accusations falsely connecting them to the immigrant detention facilities for separated children that were the focus of the Families Belong Together movement and the resistance to the Trump Administration's family separation policy.  Although neither CoreCivic nor

---

[9] CoreCivic, *What We Do*, http://www.corecivic.com/hubfs/_resources/What%20We%20Do%20Card.pdf ("We don't provide housing for any children who aren't under the supervision of a parent. We also don't operate shelters for unaccompanied minors, nor do we operate border patrol facilities.").

GEO Group run any of those facilities, Defendants targeted CoreCivic and GEO Group because they have the two largest market capitalizations in the private prison industry and therefore offered Defendants the largest potential financial gain from redirected capital.

48.     Defendants launched a comprehensive campaign across multiple public channels to exploit the Families Belong Together movement, to mislead the public about CoreCivic's involvement in the family separation policy, and to encourage investors, institutions, and banks to divest from CoreCivic and invest in products from which Defendants profit.  For example, in a September 25, 2018 Forbes post entitled "What Do Big Banks Have To Do With Family Detention? #FamiliesBelongTogether Explains," Defendants wrote:

> The two largest prison companies, CoreCivic and Geo Group, have over $2BN a year in ICE contracts, managing some of the detention centers that have been at the heart of the controversy over the separation of families…."[10]

49.     Defendants went on to plug Candide by stating that the company joined the Families Belong Together movement to urge banks to stop financing CoreCivic.  *Id.*

50.     As part of that post, Defendants promoted two Families Belong Together coalition members in Defendants' pitch to potential investors about "the relationship of banks to family detention," with the intent of convincing potential investors that they can help stop family separation as "both investors and retail

---

[10] Morgan Simon, *What Do Big Banks Have To Do With Family Detention? #FamiliesBelongTogetherExplains*, Forbes (Sept. 25, 2018), https://www.forbes.com/sites/morgansimon/2018/09/25/what-do-big-banks-have-to-do-with-family-detention-familiesbelongtogether-explains/#5adf83f62b6a, attached as Exhibit A.

customers" by divesting from any financial institution with ties to CoreCivic. *Id.*

51.     In a March 5, 2019 Forbes post entitled "JPMorgan Chase is Done With Private Prisons"[11] and a September 30, 2019 post entitled "GEO Group Running Out of Banks as 100% of Known Banking Partners Say 'No' to the Private Prison Sector,"[12] Defendants connected banks' withdrawal of funding to the Families Belong Together campaign against the family separation policy.

52.     In Defendants' posts urging divestment from CoreCivic, Defendants beckoned potential investors to invest in the alternative investments from which they profit—with $40 million of client assets under management—by hyperlinking to Defendants' website and social media feeds that promote Candide, its products, and Simon's book.

53.     Defendants also used Twitter to help boost the reach of their smear campaign against CoreCivic and to encourage people to divest from CoreCivic in favor of the investment products from which Defendants profit.

54.     Simon, acting on behalf of herself and Candide, tweeted links to Defendants' Forbes posts about CoreCivic, and in a March 6, 2019 tweet, Simon coupled the Forbes marketing piece with the hashtag "#FamiliesBelongTogether," to ensure that readers would tie the statements in her posts about CoreCivic to the detention of immigrant children separated from their parents:

---

[11] Morgan Simon, *JPMorgan Chase Is Done With Private Prisons*, Forbes (Mar. 5, 2019), https:///www.forbes.com/sites/morgansimon/2019/03/05/jpmorgan-chase-is-done-with-private-prisons/#123dd363690d, attached as Exhibit B.

[12] Morgan Simon, *GEO Group Running Out of Banks as 100% of Known Banking Partners Say 'No' to the Private Prison Sector*, Forbes (Sept. 30, 2019), https://www.forbes.com/sites/morgansimon/2019/09/30/geo-group-runs-out-of-banks-as-100-of-banking-partners-say-no-to-the-private-prison-sector/#7b005d032986, attached as Exhibit C.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22



23      55.     Defendants knew that tying CoreCivic to the movement against

24   family separation would mislead the public to conclude that CoreCivic ran the

25   facilities that detained unaccompanied minors and were the focus of the movement:

26   Defendants admitted in a "clarification" to the March 5, 2019 post that they know

27
28

that the terminology "family separation" focuses on "the detention of children."[13]

56.     The Defendants' tweets also misled the public about CoreCivic by conveying that large financial institutions withdrew their financing from CoreCivic in response to the Families Belong Together movement, while deliberately omitting the material fact that CoreCivic does not and has never run the immigrant detention facilities for separated children that were at the heart of that movement:



[13] Morgan Simon, *JPMorgan Chase Is Done With Private Prisons*, Forbes (updated Oct. 10, 2019), https://www.forbes.com/sites/morgansimon/2019/03/05/jpmorgan-chase-is-done-with-private-prisons/ - 73470464690d, attached as Exhibit D.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19



20     57.     Simon appeared on The Van Jones Show to talk about Defendants'

21   campaign against companies like CoreCivic.  During that interview, Simon took

22   credit for the financial and reputational harm Defendants' accusations have caused

23   CoreCivic, stating that through the Families Belong Together coalition she has been

24   able to pressure "over 60 percent" of the known banks providing credit and term

25   loans to CoreCivic" to pull their funding which "mean[s] [CoreCivic is] going to be

26   struggling when it's time to raise more money...."[14]

27   _____

28   [14] The Van Jones Show, CNN (Oct. 19, 2019), *transcript available at,*

**Defendants Knew and Recklessly Disregarded the Falsity of Their Claims About CoreCivic's Involvement in the Family Separation Policy**

58.     On the "What We Do" section of CoreCivic's publicly available website, the company states in bold print that "CoreCivic never has and never will house unaccompanied minors."[15]

59.     This information was readily available to Defendants before they published their false accusations on Forbes.com and on their social media accounts. CoreCivic being one of Defendants' primary targets, Defendants have visited and read CoreCivic's website, including the "What We Do" section of it.

60.     Moreover, Defendants close the protests of the immigrant detention facilities that house unaccompanied minors.  Accordingly, Defendants had first-hand knowledge that none of those facilities are operated by CoreCivic.

61.     Defendants purposefully avoided reaching out to CoreCivic for comment before publishing their false accusations about the company because they knew that the truthful information CoreCivic would have provided undercuts the Defendants' marketing materials and investment strategies.

62.     On October 2, 2019, CoreCivic sent a letter putting Defendants on formal notice of the facts—CoreCivic has never and will never house unaccompanied minors pursuant to the family separation policy—and demanding that the false accusations be retracted.[16]

63.     Instead of retracting their false statements, Defendants published a purported "clarification" to the March 5 post that dismisses the truth as something

---

http://transcripts.cnn.com/TRANSCRIPTS/1910/19/vjs.01.html.

[15] CoreCivic, *What We Do, What We Don't Do*, http://www.corecivic.com/what-we-do-what-we-dont-do.

[16] Letter from Elizabeth Locke and Megan Meier to Morgan Simon (October 2, 2019), attached as Exhibit E.

"CoreCivic has stated," and states that Defendants view "the phenomena of family separation" as including incarceration *of any kind*.[17]

64.     Defendants' writings reveal that Defendants knew that their posts about CoreCivic, "family separation," and the "Families Belong Together" movement would be understood by reasonable readers to mean that CoreCivic operates immigrant detention facilities for children separated from their parents at the U.S. border pursuant to the family separation policy.

65.     For example, in both their October 10 response letter to CoreCivic and in their "clarification" to the March 5 post, Defendants admitted that the "terminology of 'family separation' tends to focus on the detention of children."[18]

66.     In their September 25, 2018 post, Defendants published a marketing piece featuring members of Families Belong Together who explained that the movement "emerged in response to the family detention crisis, starting with the recent separation of families at the border...."[19]  In that post, Defendants also falsely claimed that "CoreCivic … manag[es] some of the detention centers that have been at the heart of the controversy over the separation of families and incarceration of individuals for crossing the US border."  *Id.*

67.     After receiving CoreCivic's letter explaining that the company does not and has never managed any of the detention centers at the heart of the family separation controversy, Defendants made a deliberate choice to republish their false statement to a new audience by hyperlinking to that post in their update to the March 5, 2019 post.[20]

_____

[17] Exhibit D.

[18] *See Id.*

[19] Exhibit A.

[20] Exhibit D.

68.     On October 29, 2019, CoreCivic sent another letter apprising Defendants of the facts—CoreCivic has never and will never house unaccompanied minors pursuant to the family separation policy—and again demanding that the false accusations be retracted.[21]  Defendants did not retract them.

### Defendants Falsely Accuse CoreCivic of
### Lobbying For Harsher Sentences And Immigration Laws

69.     Beginning in March 2019, Defendants launched a smear campaign against CoreCivic on a second front: falsely accusing the company of lobbying for harsher sentences and immigration laws.

70.     Defendants published these false claims in order to promote the investment products from which Defendants profit by deceiving investors, institutions, and banks about CoreCivic's lobbying efforts.

71.     For example, in their March 5, 2019 post touting JPMorgan Chase's withdrawal of financing from "the private-prison industry," Defendants wrote:

> GEO Group and CoreCivic have a long history of profiting from mass incarceration: they make money when beds are filled, justly or unjustly, which is why they've spent $25M on lobbying over the past three decades to push for harsher criminal justice and immigration laws.[22]

72.     Defendants also published this false claim in their September 30, 2019 post applauding large financial institutions for divesting from CoreCivic and encouraging other institutions, investors, and banks to do the same.  In that post,

---

[21] Letter from Elizabeth Locke and Megan Meier to Marcia Hoffman (October 29, 2019), attached as Exhibit F.

[22] Exhibit B.

Defendants wrote:

> Given [CoreCivic's and GEO Group's] business model
> depends on keeping a consistent number of people
> incarcerated, it's been speculated and critiqued that this is
> why GEO Group and CoreCivic have spent $25M on
> lobbying over the past three decades to push for harsher
> criminal justice and immigration laws.[23]

73.     In the same paragraph, Defendants encouraged "every day" people to put an end to CoreCivic's purported efforts to "funnel[] more detainees into their facilities" by closing their accounts with banks that finance CoreCivic:

> A cycle emerges when one follows the money in banks,
> banks lend that money out to the private prison industry,
> the private prison industry uses that financing for their
> day to day work including lobbying, which successfully
> funnels more detainees into their facilities, and banks reap
> a payoff from their loans.[24]

74.     In both posts, while imploring investors to divest from CoreCivic, Defendants encourage potential investors to invest in their alternative investments by hyperlinking to Simon's website and social media feeds, which promote Candide and its products.

**CoreCivic Does Not Lobby For Any Policies Or Legislation That Would Determine The Basis For Or Duration Of Any Individual's Incarceration Or Detention**

75.     CoreCivic has never lobbied for harsher sentences or immigration

---

[23] Exhibit C.

[24] *Id.*

1  laws.

2       76.     To the contrary, CoreCivic has lobbied in favor of criminal justice

3  reforms to reduce recidivism and incarceration rates by helping people successfully

4  reenter society upon their release.

5       77.     In 2014, Core Civic made a series of commitments with the goal of

6  creating the best inmate reentry program in corrections facilities.  The three core

7  pledges were:

8       •   Reentry will be a "Day One" priority at CoreCivic facilities;

9       •   Every CoreCivic professional will be a reentry professional;

10      •   Every dollar government partners invest in reentry will be a dollar

11          proven to reduce recidivism.

12      78.     Along with these commitments, CoreCivic has established

13  measurable goals for evaluating success and holding itself accountable for long-

14  term progress.

15             **Defendants Knew And Recklessly Disregarded The Truth**

16                   **About CoreCivic's Lobbying Efforts**

17      79.     In publishing their false claims about CoreCivic's lobbying activity,

18  Defendants knew and recklessly disregarded the facts.

19      80.     Before publication, Defendants were aware of and read at least two

20  articles that rebutted their false claims about CoreCivic's lobbying efforts.

21      81.     First, Defendants had read an NPR article stating that CoreCivic

22  (formerly known as Corrections Corporation of America) had no role in drafting or

23  supporting the Arizona immigration law that required law enforcement to arrest and

24  detain anyone who could not show proof that they were in the U.S. legally.[25]

25

26  _____

27  [25] Laura Sullivan, *Prison Economics Help Drive Ariz. Immigration Law*, NPR (Oct.
    28, 2010), https://www.npr.org/2010/10/28/130833741/prison-economics-help-

28  drive-ariz-immigration-law.

82.    Second, Defendants had read a Business Insider article that expressly acknowledged that CoreCivic does not lobby for any policies that "determine 'the basis for or duration of an individual's incarceration or detention.'"[26]

83.    CoreCivic's website also contains detailed information about the company's lobbying activity, including several annual "Political Activity and Lobby Reports," and states:

> CoreCivic's political and governmental relations activities are designed to educate federal, state and local officials on the benefits of partnerships corrections, CoreCivic's ability to assist them in meeting their needs and our track record of success.  Our company does not, under longstanding policy, lobby for or against policies or legislation that would determine the basis for or duration of an individual's incarceration or detention.

84.    CoreCivic being one of their primary targets, Defendants have visited and read CoreCivic's website, including the "Political Activity and Lobbying Reports" section of it.

85.    In addition to this information that was in Defendants' hands before publication, the nature of CoreCivic's lobbying activity is also disclosed in numerous reliable sources in the public domain, including government websites and non-profit websites.

86.    For example, both Senate.gov and House.gov provide easy access

---

[26] Michelle Mark, *The biggest problem with private prisons starts on Capitol Hill*, Business Insider (Aug. 20, 2016), https://www.businessinsider.com/private-prisons-lobby-for-their-own-existence-2016-8.

to the Lobbying Act Disclosure Database.[27]  With respect to CoreCivic, each relevant disclosure form noticeably states that under CoreCivic's policy, the company does **"not lobby for or against any policies or legislation that would determine the basis for an individual's incarceration or detention**."[28]

87.      A simple Google search also reveals that many non-profits and government watchdogs have databases on their websites allowing users to search for lobbying disclosures.

88.      ProPublica's database yields results for CoreCivic's lobbying activities,[29] and the details provided on these disclosures contain a clear disclaimer that "Consistent with CoreCivic Policy," the firm "does not lobby for or against any policies or legislation that would determine the basis for an individual's incarceration or detention." [30]

89.      OpenSecrets.org's database also produces CoreCivic's lobbying

_____

[27] *See* The United States Senate, Query the Lobby Disclosure Act Database, https://soprweb.senate.gov/index.cfm?event=selectFields&reset=1; https://disclosurespreview.house.gov/?index=%22lobbying-disclosures%22&size=10&sort=[{%22_score%22:true},{%22field%22:%22registrant.name%22,%22order%22:%22asc%22}].

[28] Examples of this language can be found on the Senate.gov website at: https://soprweb.senate.gov/index.cfm?event=getFilingDetails&filingID=83F35D12-FB49-4FBF-8F8A-47F6ED682B84&filingTypeID=60 and the House.gov website here: http://disclosures.house.gov/ld/ldxmlrelease/2019/Q2/301058394.xml.

[29] ProPublica, https://projects.propublica.org/represent/lobbying/search?utf8=%E2%9C%93&search=CoreCivic+Inc.&commit=Search.

[30] ProPublica, CoreCivic, Inc.,https://projects.propublica.org/represent/lobbying/r/301016424; ProPublica, CoreCivic, Inc.,https://projects.propublica.org/represent/lobbying/r/300981160; ProPublica, CoreCivic, Inc.,https://projects.propublica.org/represent/lobbying/r/301016853; ProPublica, CoreCivic, Inc.,https://projects.propublica.org/represent/lobbying/r/300983664.

reports by year, and each report identifies the issues the lobbying firms employed by CoreCivic work on and contains the same disclosure above.[31]

90.     Because CoreCivic was a primary target of their marketing and investment strategy, Defendants visited and reviewed this publicly-available information about CoreCivic on at least one of these websites and knew, before making their false statements, that CoreCivic does not and has not lobbied for harsher sentences and immigration laws. Defendants intentionally disregarded this wealth of publicly available information.

91.     Defendants also purposefully avoided reaching out to CoreCivic for comment before publication, because they knew that CoreCivic would provide them truthful information that it does not lobby for longer sentences, which would have undercut Defendants' investment and marketing strategies.

**Defendants Refuse To Retract Their False Claims That CoreCivic Lobbies For Harsher Sentencing And Immigration Laws And Instead Publish New False Claims**

92.     In the October 2, 2019 letter, CoreCivic apprised Defendants of the truth about its lobbying activities, directed them to the publicly available information confirming the facts, and demanded that the false claims be retracted.

93.     Instead of retracting their statements, Defendants doubled down and published additional false allegations about CoreCivic's lobbying efforts.

94.     Despite CoreCivic's explicit request that Defendants reach out to the company before publishing any additional claims about it, Defendants again purposefully avoided contacting CoreCivic for comment before publishing new false statements about the company.

---

[31] OpenSecrets, CoreCivic, Inc.,
https://www.opensecrets.org/orgs/lobby.php?id=D000021940.

95.       In their October 10, 2019 "updates" to the March 5 and September 30 posts,[32] Defendants dismissed the truth as something "CoreCivic say[s]," and doubled down on their false allegations about the company's lobbying activities, writing that:

> Disclosures show [CoreCivic has] lobbied on a number of bills related to funding of ICE enforcement over the years. GEO Group and CoreCivic say that they don't lobby on legislation or policies that would affect the basis for or length of incarceration or detention, but according to the Justice Policy Institute, [the] compan[y] ha[s] served on task forces of the American Legislative Exchange Council (ALEC), which has written and promoted model legislation focused on mandatory minimum sentences, three strikes laws, and 'truth in sentencing' legislation.

96.       As Defendants intended, this passage again falsely conveys to readers that CoreCivic lobbies for harsher criminal sentences.

97.       It also contains new false allegations about CoreCivic, accusing the company of partnering with ALEC to write and promote legislation for mandatory minimum sentences, three strikes laws, and "truth in sentencing" legislation.

98.       These new allegations are also false.

99.       CoreCivic has never written or promoted model legislation focused on mandatory minimum sentences, three strikes laws, or "truth in sentencing"

---

[32] Exhibit D; Morgan Simon, *GEO Group Running Out of Banks as 100% of Known Banking Partners Say 'No' to the Private Prison Sector*, Forbes (Oct. 10-11, 2019 update), https://www.forbes.com/sites/morgansimon/2019/09/30/geo-group-runs-out-of-banks-as-100-of-banking-partners-say-no-to-the-private-prison-sector/#3eafc7593298, attached as Exhibit G.

1   legislation.

2        100.     While CoreCivic had a passive, non-voting membership in

3   ALEC—America's largest nonpartisan organization of state legislatures—it has not

4   been a member or had any involvement with ALEC in nearly a decade.

5        101.     The report cited by Defendants in support of their false accusation

6   about CoreCivic's lobbying activities is misleading and nearly a decade old.

7        102.     Before publishing these additional false statements, Defendants

8   were aware of the lobbying disclosures showing CoreCivic's lobbying, that

9   Defendants falsely described as "related to funding for ICE enforcement," did *not*

10   seek to increase enforcement of immigration laws or increase the amount of

11   immigrant detention or incarceration in any way, but included lobbying for the

12   "Cellphone Jamming Reform Act," which would *make prisons safer* by enabling

13   them to block contraband cellphones that pose a serious risk to security; for

14   appropriations bills so that the government would be able to honor existing

15   contracts; and for the "Fair Chance to Compete for Jobs Act," to *help former*

16   *inmates* compete fairly for employment with federal agencies and federal

17   contractors.

18        103.     In the October 29, 2019 letter, CoreCivic *again* apprised

19   Defendants of the truth about its lobbying activities and demanded that the false

20   claims be retracted—including the new false claims.[33]  Defendants did not retract

21   their false statements.

22           **CoreCivic Has Suffered Reputational And Financial Harm**

23           **As A Result of Defendants' False Accusations**

24        104.     As a result of Defendants' false accusations, CoreCivic has suffered

25   reputational and financial harm.

26        105.     Defendants intended to harm CoreCivic.  Defendants admittedly

27   _____

28   [33] Exhibit F.

attempted to influence investors to divest from CoreCivic, encouraged the public to stop working with banks that finance CoreCivic, and pressured banks to stop financing CoreCivic.

106.    Before Defendants' publication of the false accusations about CoreCivic and their campaign to encourage banks to stop financing CoreCivic's industry, many large banks were competing for CoreCivic's business.  This competition gave CoreCivic leverage to negotiate favorable financing terms.

107.    In early March of 2019, JP Morgan, a bank with which CoreCivic had a banking relationship, announced that it would no longer bank with the private prison industry because, companies in CoreCivic's industry had become targets of protests over Trump administration immigration policies.

108.    Defendants immediately took to the Forbes platform to congratulate themselves for their role in causing JP Morgan's announcement—writing in their March 5th post: "in 2018, united under the hashtag #FamiliesBelongTogether, 80+ organizations came together to form a corporate accountability committee targeting big banks…Candide Group and its project Real Money Moves, are members of this committee."[34]

109.    Nevertheless, another bank indicated that it would be able to arrange a loan for CoreCivic with favorable terms.

110.    Then on June 26, 2019, Bank of America announced that it would no longer finance private prison companies, which, on information and belief, it did because of public pressure that Defendants created with their false accusations about CoreCivic.

111.    Again, Defendants took to the Forbes platform to applaud themselves for their work in pushing Bank of America to make that decision, under

---

[34] Exhibit B.

the banner of #FamiliesBelongTogether.[35]  Defendants also noted that the bank's decision came on the heels of a viral image showing a father and his two-year-old daughter who had drowned trying to enter the US border, writing: "exposure to the graphic treatment of migrant children has sparked debate and outrage in the US (and beyond) about the ways in which we not only allow—but actually profit from—the suffering of asylum seekers."

112.     Defendants' June 26th story also noted that Bank of America's decision corresponded with protests by Wayfair workers who were angry about the company's "decision to sell furniture to operators of facilities for migrant children detained at the border."

113.     The very next day, a majority of the investors who had committed to investing in CoreCivic's Term Loan B withdrew their proposals and the bank arranging the financing was unable to consummate the deal.

114.     While on the October 19, 2019 Van Jones show, Simon, speaking on behalf of herself and Candide, boasted about the financial and reputational damage Defendants' accusations had done, stating that through the Families Belong Together coalition, Defendants had been able to encourage "over 60 percent" of the known banks providing "credit and term loans to CoreCivic" to pull their funding which "means [CoreCivic is] going to be struggling when it's time to raise more money... ."[36]

115.     Defendants made similar claims in an October 24, 2019 SoCap19 panel discussion and encouraged the audience to cheer for the financial and

---

[35] Morgan Simon, *Bank of America, Wayfair, Join those Saying "No" To Profiting From Family Detention*, Forbes (June 26, 2019), https://www.forbes.com/sites/morgansimon/2019/06/26/bank-of-america-wayfair-join-those-saying-no-to-profiting-from-family-detention/#168621c56200.

[36] The Van Jones Show, CNN (Oct. 19, 2019), *transcript available at*, http://transcripts.cnn.com/TRANSCRIPTS/1910/19/vjs.01.html.

reputational damage they had done to CoreCivic.[37]

116.     In December 2019, CoreCivic entered into a new Term Loan B. However, due to the market pressure that Defendants deliberately manufactured with their false accusations, the Term Loan B was at a higher interest rate and on less favorable terms than had been offered in June 2019.  The higher borrowing costs amount to nearly $8 million more per year than the cost under the previous loan terms.

117.     In sum, as a result of Defendants, false accusations, CoreCivic has suffered reputational and financial harm.

## COUNT ONE – DEFAMATION
## (AGAINST ALL DEFENDANTS)

118.     Plaintiff repeats and re-alleges each of the foregoing paragraphs as if set forth fully herein.

119.     Defendants made false and defamatory statements about CoreCivic to a worldwide internet audience on multiple occasions beginning on March 5, 2019.

120.     Specifically, Defendants made the following false and defamatory statements of fact concerning CoreCivic:

    a.  On March 5, 2019, Defendants published an article on the Forbes.com platform titled *JPMorgan Chase Is Done With Private Prisons*, which states: "After years of targeted actions by everyday activists and concerned shareholders, JP Morgan Chase announced early this morning that they will stop financing GEO Group and *CoreCivic—the largest operators of*

---

[37] SOCAP, *SOCAP10 Livestream Oct. 24*, YouTube (Oct. 24, 2019), https://www.youtube.com/watch?v=oFPy8nlWDIo&t=12509s.

*private prisons and immigrant detention centers in the U.S.* … As explored in "What Do Big Banks Have to Do With Private Prisons," GEO Group and CoreCivic have a long history of profiting from mass incarceration: *they make money when beds are filled, justly or unjustly, which is why they've spent $25M on lobbying over the past three decades to push for harsher criminal justice and immigration laws.* Interestingly, while only 10% of prisons and jails nationwide are for-profit, a third of all immigration detention centers are privately owned… receiving over $1B a year in contracts from ICE (almost $5.5M a day of taxpayer money). Since *news of family separation at the southern border began shedding more light on the abuses inside such private facilities*, activists across the country have been paying careful attention to who actually enables private prison companies in their day to day operations. In other words, they've been meticulously following the money story behind the story – and found that brand-name banks like Chase, Wells Fargo and Bank of America have provided billions in financing to private prisons over the past decade. Over the past few years, there's been a steady drumbeat of actions from civil society addressing this relationship. … Then in 2018, *united under the hashtag #FamiliesBelongTogether, 80+ organizations*—from immigrant rights nonprofits to social investing firms—*came together to form a corporate accountability committee targeting big banks through both insider conversations and consumer-facing strategies* (in full disclosure, the *author's firm Candide Group*, and its project Real Money Moves, *are members of the committee*). … On February 14th, *Families*

1    *Belong Together coalition members* … put this ethos into

2    action with *protests at over 100 bank branches, and over*

3    *150,000 petition signatures asking Chase and Wells Fargo to*

4    *break up with private prisons—or pledging to break up with*

5    *their banks instead*."

6    b.  On March 5, 2019 and again on October 10, 2019, Defendants

7        republished their article titled *What Do Big Banks Have* To *Do*

8        *With Family Detention? #FamiliesBelongTogether Explains* on

9        the Forbes.com platform, by publishing a hyperlink to the

10       article, describing the article, and inviting readers to read it.  The

11       article states: "The two largest private prison companies,

12       *CoreCivic* and GeoGroup, have over $2BN a year in ICE

13       contracts, *managing some of the detention centers that have*

14       *been at the heart of the controversy over the separation of*

15       *families and incarceration of individuals for crossing the US*

16       *border*.  Most investors are unlikely to have these two

17       companies directly in their portfolio—managed as REITS, they

18       are majority-owned by the funds Vanguard and Fidelity—but

19       that means your portfolio may still be connected to private

20       prisons, and by extension, the family detention crisis.  More than

21       85 organizations … have joined under a coalition effort called

22       *Families Belong Together* to urge Wells Fargo and JP Morgan

23       Chase to stop financing Geo Group and *CoreCivic*.  … *Families*

24       *Belong Together emerged in response to the family detention*

25       *crisis, starting with the recent separation of families at the*

26       *border* which drew national attention to what has been a long-

27       standing issue. *The coalition's work is widespread, given the*

28       *depth of the crisis, from helping to reunite families* to seeking

just and comprehensive immigration reform. There is specifically a Corporate Accountability branch of the coalition focused on addressing the role of ***CoreCivic*** and GEO Group, two ***large for-profit prison corporations that hold contracts to operate detention centers, and are profiting off the pain and separation of families.*** … We … have long worked on ***family separation*** and the incarceration of our families at the border. … ***At the Trump Administration's direction, children have been intentionally separated from their parents and held in detention***, immigrants <u>seeking asylum</u> have been incarcerated, and, more recently, allegations have emerged of numerous cases involving federal officials' <u>verbal, physical and sexual abuse of migrant children</u> within detention facilities."

   c. On March 6, 2019, Defendants republished the above statements on Twitter by hyperlinking to their March 5, 2019 article:



d. On September 30, 2019, Defendants published an article on the Forbes.com platform titled *GEO Group Runs Out of Banks as 100% of Banking Partners Say 'No' to the Private Prison Sector*, which stated: "All of the existing banking partners to private prison leader GEO Group have now officially committed to ending ties with the private prison and immigrant detention industry.  These banks are JPMorgan Chase, Wells Fargo, Bank of America, SunTrust, BNP Paribas, Fifth Third Bancorp, Barclays, and PNC.  This exodus comes in the wake of demands by grassroots activists—many under the banner of the

1   *#FamiliesBelongTogether* coalition—shareholders,

2   policymakers, and investors.  Major banks supporting the

3   private prisons behind mass incarceration and immigrant

4   detention have now committed to not renew $2.4B in credit lines

5   and term loans to industry giants GEO Group and *CoreCivic*.

6   … *Given their business model depends on keeping a*

7   *consistent and increasing number of people incarcerated, it's*

8   *been speculated and critiqued that this is why GEO Group and*

9   *CoreCivic have spent $25M lobbying over the past three*

10   *decades to push for harsher criminal justice and immigration*

11   *laws.*  A cycle emerges when one follows the money: everyday

12   people put their money in banks, banks lend that money out to

13   the private prison industry, *the private prison industry uses that*

14   *financing for their day to day work including lobbying, which*

15   *successfully funnels more detainees into their facilities*, and

16   banks reap a payoff from their loans.  Banks are only one piece

17   of the wider financial lives of private prison companies, which

18   include share ownership, bond underwriting, the purchase of

19   bonds, and others.  Still, in the wake of reputational risk and

20   falling share prices, it is questionable at best if new partners will

21   take the leap to join GEO Group and *CoreCivic* in business and

22   fill their financing gaps.  In addition to the

23   *#FamiliesBelongTogether* coalition representing over 100

24   million people nationwide, asset owners and managers of the

25   Interfaith Center on Corporate Responsibility and the

26   Confluence Philanthropy network, representing over $2B in

27   AUM, added their voices to a public letter demanding that banks

28   stop financing the private prison industry.  …  In the meantime,

1   there's speculation about what the remaining five banks—

2   Regions, Citizens, Pinnacle, First Tennessee, and Synovus—will

3   do about their ties to private prisons and immigrant detention."

4   e. On October 10, 2019, Defendants published the following

5   statements by revising their March 5, 2019 article: "After years

6   of targeted actions by everyday activists and concerned

7   shareholders, JP Morgan Chase announced early this morning

8   that they will stop financing GEO Group and *CoreCivic—the*

9   *largest operators of private prisons and immigrant detention*

10   *centers in the U.S.* … As explored in "What Do Big Banks

11   Have to Do With Private Prisons," GEO Group and CoreCivic

12   have a long history of profiting from mass incarceration: *they*

13   *make money when beds are filled, justly or unjustly. Together,*

14   *they've spent a combined $25M on lobbying over the past three*

15   *decades. Disclosures show they've lobbied on a number of*

16   *bills related to funding for ICE enforcement over the years.*

17   *GEO Group and CoreCivic say that they don't lobby on*

18   *legislation or policies that would affect the basis for or length*

19   *of incarceration or detention, but according to the Justice*

20   *Policy Institute, both companies have served on task forces of*

21   *the American Legislative Exchange Council (ALEC), which*

22   *has written and promoted model legislation focused on*

23   *mandatory minimum sentences, three strikes laws, and "truth*

24   *in sentencing" legislation.* Interestingly, while only 10% of

25   prisons and jails nationwide are for-profit, a third of all

26   immigration detention centers are privately owned… receiving

27   over $1B a year in contracts from ICE (almost $5.5M a day of

28   taxpayer money). Since *news of family separation at the*

*southern border began shedding more light on the abuses inside such private facilities*, activists across the country have been paying careful attention to who actually enables private prison companies in their day to day operations.  In other words, *they've been meticulously following the money story behind the story – and found that brand-name banks like Chase, Wells Fargo and Bank of America have provided billions in financing to private prisons over the past decade*.  Over the past few years, there's been a steady drumbeat of actions from civil society addressing this relationship. … Then in 2018, *united under the hashtag #FamiliesBelongTogether, 80+ organizations*—from immigrant rights nonprofits to social investing firms—*came together to form a corporate accountability committee targeting big banks through both insider conversations and consumer-facing strategies* (in full disclosure, *the author's firm Candide Group*, and its project Real Money Moves, *are members of the committee*). … On February 14th, *Families Belong Together coalition members* … put this ethos into action with *protests at over 100 bank branches, and over 150,000 petition signatures asking Chase and Wells Fargo to break up with private prisons—or pledging to break up with their banks instead*. … *Clarification: This article does not intend to suggest that CoreCivic or GEO Group housed children separated from their parents pursuant to the Trump family separation policy.  CoreCivic has stated, "CoreCivic does not and has never housed children separated from their parents pursuant to the Trump family separation policy."  … While the terminology of "family separation"*

1   *tends to focus on the detention of children, I view the*
2   *phenomena of family separation as more broad (for instance,*
3   *inclusive of separating a grown adult from their aging parent,*
4   *or spouse from spouse, or a parent being incarcerated while*
5   *their child remains free, etc.).  Family separation is thus*
6   *practiced in the context of both immigration and mass*
7   *incarceration, such that it is possible to participate in family*
8   *separation without participating in the housing of children.*"
9   f.   On October 10-11, 2019, Defendants published the following
10      statements by revising their September 30, 2019 article on the
11      Forbes.com platform: "*Given their business model depends on*
12      *keeping a consistent and increasing number of people*
13      *incarcerated, it's been speculated and critiqued that this is why*
14      *GEO Group and CoreCivic have spent $25M lobbying over the*
15      *past three decades*.  Disclosures show they've lobbied on a
16      number of bills related to funding for ICE enforcement over the
17      years.  Both GEO Group and CoreCivic say that they don't
18      lobby on legislation or policies that would affect the basis for or
19      length of incarceration or detention, but according to the Justice
20      Policy Institute, both companies have served on task forces of
21      the American Legislative Exchange Council (ALEC), which has
22      written and promoted model legislation focused on mandatory
23      minimums sentences [sic], three strikes laws, and "truth in
24      sentencing legislation."
25   121.   Defendants' statements were intended to and did falsely convey
26   that CoreCivic operates immigrant detention facilities for children separated from
27   their parents at the border and that CoreCivic lobbies for harsher sentencing and
28   immigration laws.

122.     Defendants' accusations are reasonably understood to be statements of fact about CoreCivic, and were understood by people who read them to be statements of fact about CoreCivic.

123.     Defendants' statements are false.  CoreCivic does not and has never operated immigrant detention facilities for children separated from their parents at the border.  Those facilities are operated by the government or by other companies. Under long-standing policy, CoreCivic does not lobby for harsher sentencing or immigration laws.

124.     Defendants' statements are defamatory and libelous *per se*. Defendants' falsehoods have exposed CoreCivic to hatred and contempt.  Indeed, Defendants have boasted about the success they have had in causing the public to shun and avoid the company and in driving up the cost of capital.  Defendants' statements were calculated to—and did in fact—provoke outrage and cause the company reputational and financial damage, to Defendants' financial benefit.

125.     Defendants had no applicable privilege or legal authorization to make these false and defamatory statements or, if they did, they abused it.

126.     As set forth above in detail, Defendants published these statements with actual malice, including by disregarding their first-hand knowledge, purposefully avoiding or intentionally disregarding numerous publicly available sources rebutting their false claims, purposefully avoiding contacting CoreCivic for comment before publication, and—when specifically put on notice of the truth and asked to retract—doubling down on and republishing their false accusations, all in furtherance of their plan to enrich themselves at CoreCivic's expense.  Upon information and belief, discovery will reveal additional evidence of Defendants' actual malice, including their financial motivation to divert capital from CoreCivic to the investment products from which they profit.

127.     Defendants made these false and defamatory statements intentionally, willfully, maliciously, and in conscious disregard of CoreCivic's

1  rights and reputation and of the truth.

2      128.    Defendants' defamatory falsehoods have been repeated and

3  republished by numerous people, which was reasonably foreseeable to—and

4  specifically intended and expected by—Defendants.

5      129.    As a direct and foreseeable result of Defendants' false and

6  defamatory accusations, CoreCivic has suffered financial and reputational harm.

7      130.    As a result of Defendants' false and defamatory accusations,

8  CoreCivic has been forced to make an expenditure of money to remedy the

9  defamation.

10      131.    In view of the forgoing, CoreCivic is entitled to actual, assumed,

11  punitive, and other damages in an amount to be specifically determined at trial.

12  **COUNT TWO – DEFAMATION BY IMPLICATION**

13  **(AGAINST ALL DEFENDANTS)**

14      132.    Plaintiff repeats and re-alleges each of the foregoing paragraphs as

15  if set forth fully herein.

16      133.    Defendants made a series of statements that were reasonably

17  capable of sustaining an incorrect and defamatory meaning about CoreCivic to a

18  worldwide internet audience on multiple occasions beginning on March 5, 2019.

19      134.    Specifically, Defendants juxtaposed the following series of facts

20  and statements so as to imply a defamatory connection between them or otherwise

21  create a defamatory implication concerning CoreCivic:

22      135.    On March 5, 2019, Defendants published an article on the

23  Forbes.com platform titled *JPMorgan Chase Is Done With Private Prisons*, which

24  states: "After years of targeted actions by everyday activists and concerned

25  shareholders, JP Morgan Chase announced early this morning that they will stop

26  financing GEO Group and ***CoreCivic—the largest operators of private prisons and***

27  ***immigrant detention centers in the U.S.*** … As explored in "What Do Big Banks

28  Have to Do With Private Prisons," GEO Group and CoreCivic have a long history

of profiting from mass incarceration: ***they make money when beds are filled, justly or unjustly, which is why they've spent $25M on lobbying over the past three decades to push for harsher criminal justice and immigration laws.***  Interestingly, while only 10% of prisons and jails nationwide are for-profit, a third of all immigration detention centers are privately owned… receiving over $1B a year in contracts from ICE (almost $5.5M a day of taxpayer money).  Since ***news of family separation at the southern border began shedding more light on the abuses inside such private facilities***, activists across the country have been paying careful attention to who actually enables private prison companies in their day to day operations.  In other words, they've been meticulously following the money story behind the story – and found that brand-name banks like Chase, Wells Fargo and Bank of America have provided billions in financing to private prisons over the past decade.  Over the past few years, there's been a steady drumbeat of actions from civil society addressing this relationship. … Then in 2018, ***united under the hashtag #FamiliesBelongTogether, 80+ organizations***—from immigrant rights nonprofits to social investing firms—***came together to form a corporate accountability committee targeting big banks through both insider conversations and consumer-facing strategies*** (in full disclosure, the ***author's firm Candide Group***, and its project Real Money Moves, ***are members of the committee***). … On February 14th, ***Families Belong Together coalition members*** … put this ethos into action with ***protests at over 100 bank branches, and over 150,000 petition signatures asking Chase and Wells Fargo to break up with private prisons—or pledging to break up with their banks instead***."

          a. On March 5, 2019 and again on October 10, 2019, Defendants republished their article titled What Do Big Banks Have To Do With Family Detention? ***#FamiliesBelongTogether*** Explains on the Forbes.com platform, by publishing a hyperlink to the article, describing the article, and inviting readers to read it.  The article

states: "The two largest private prison companies, *CoreCivic* and GeoGroup, have over $2BN a year in ICE contracts, *managing some of the detention centers that have been at the heart of the controversy over the separation of families and incarceration of individuals for crossing the US border*.  Most investors are unlikely to have these two companies directly in their portfolio— managed as REITS, they are majority-owned by the funds Vanguard and Fidelity—but that means your portfolio may still be connected to private prisons, and by extension, the family detention crisis.  More than 85 organizations … have joined under a coalition effort called *Families Belong Together* to urge Wells Fargo and JP Morgan Chase to stop financing Geo Group and *CoreCivic*.  … *Families Belong Together emerged in response to the family detention crisis, starting with the recent separation of families at the border which drew national attention to what has been a long-standing issue. The coalition's work is widespread, given the depth of the crisis, from helping to reunite families* to seeking just and comprehensive immigration reform. There is specifically a Corporate Accountability branch of the coalition focused on addressing the role of *CoreCivic* and GEO Group, two *large for-profit prison corporations that hold contracts to operate detention centers, and are profiting off the pain and separation of families.*  … We … have long worked on *family separation* and the incarceration of our families at the border. … *At the Trump Administration's direction, children have been intentionally separated from their parents and held in detention*, immigrants seeking asylum have been incarcerated, and, more recently, allegations have emerged of numerous cases involving

federal officials' <u>verbal, physical and sexual abuse of migrant children</u> within detention facilities."

b. On March 6, 2019, Defendants republished the above statements on Twitter by hyperlinking to their March 5, 2019 article:



c. On September 30, 2019, Defendants published an article on the Forbes.com platform titled *GEO Group Runs Out of Banks as 100% of Banking Partners Say 'No' to the Private Prison Sector*, which stated: "All of the existing banking partners to private prison

1    leader GEO Group have now officially committed to ending ties

2    with the private prison and immigrant detention industry.  These

3    banks are JPMorgan Chase, Wells Fargo, Bank of America,

4    SunTrust, BNP Paribas, Fifth Third Bancorp, Barclays, and PNC.

5    This exodus comes in the wake of demands by grassroots

6    activists—many under the banner of the ***#FamiliesBelongTogether***

7    coalition—shareholders, policymakers, and investors.  Major banks

8    supporting the private prisons behind mass incarceration and

9    immigrant detention have now committed to not renew $2.4B in

10   credit lines and term loans to industry giants GEO Group and

11   *CoreCivic*.  …  ***Given their business model depends on keeping a***

12   ***consistent and increasing number of people incarcerated, it's***

13   ***been speculated and critiqued that this is why GEO Group and***

14   ***CoreCivic have spent $25M lobbying over the past three decades***

15   ***to push for harsher criminal justice and immigration laws.***  A

16   cycle emerges when one follows the money: everyday people put

17   their money in banks, banks lend that money out to the private

18   prison industry, ***the private prison industry uses that financing for***

19   ***their day to day work including lobbying, which successfully***

20   ***funnels more detainees into their facilities***, and banks reap a

21   payoff from their loans.  Banks are only one piece of the wider

22   financial lives of private prison companies, which include share

23   ownership, bond underwriting, the purchase of bonds, and others.

24   Still, in the wake of reputational risk and falling share prices, it is

25   questionable at best if new partners will take the leap to join GEO

26   Group and *CoreCivic* in business and fill their financing gaps.  In

27   addition to the ***#FamiliesBelongTogether*** coalition representing

28   over 100 million people nationwide, asset owners and managers of

1 the Interfaith Center on Corporate Responsibility and the

2 Confluence Philanthropy network, representing over \$2B in AUM,

3 added their voices to a public letter demanding that banks stop

4 financing the private prison industry.  …  In the meantime, there's

5 speculation about what the remaining five banks—Regions,

6 Citizens, Pinnacle, First Tennessee, and Synovus—will do about

7 their ties to private prisons and immigrant detention."

8 d. On October 10, 2019, Defendants published the following

9 statements by revising their March 5, 2019 article: "After years of

10 targeted actions by everyday activists and concerned shareholders,

11 JP Morgan Chase announced early this morning that they will stop

12 financing GEO Group and *CoreCivic—the largest operators of*

13 *private prisons and immigrant detention centers in the U.S.*  …

14 As explored in "[What Do Big Banks Have to Do With Private](#)

15 [Prisons](#)," GEO Group and CoreCivic have a long history of

16 profiting from mass incarceration: *they make money when beds are*

17 *filled, justly or unjustly.  Together, they've spent a combined*

18 *\$25M on lobbying over the past three decades.  Disclosures show*

19 *they've lobbied on a number of bills related to funding for ICE*

20 *enforcement over the years.  GEO Group and CoreCivic say that*

21 *they don't lobby on legislation or policies that would affect the*

22 *basis for or length of incarceration or detention, but according to*

23 *the Justice Policy Institute, both companies have served on task*

24 *forces of the American Legislative Exchange Council (ALEC),*

25 *which has written and promoted model legislation focused on*

26 *mandatory minimum sentences, three strikes laws, and "truth in*

27 *sentencing" legislation.* Interestingly, while only 10% of prisons

28 and jails nationwide are for-profit, a third of all immigration

1  detention centers are privately owned… receiving over $1B a year
2  in contracts from ICE (almost $5.5M a day of taxpayer money).
3  Since **news of family separation at the southern border began**
4  **shedding more light on the abuses inside such private facilities**,
5  activists across the country have been paying careful attention to
6  who actually enables private prison companies in their day to day
7  operations.  In other words, **they've been meticulously following**
8  **the money story behind the story – and found that brand-name**
9  **banks like Chase, Wells Fargo and Bank of America have**
10  **provided billions in financing to private prisons over the past**
11  **decade**.  Over the past few years, there's been a steady drumbeat of
12  actions from civil society addressing this relationship. … Then in
13  2018, **united under the hashtag #FamiliesBelongTogether, 80+**
14  **organizations**—from immigrant rights nonprofits to social
15  investing firms—**came together to form a corporate accountability**
16  **committee targeting big banks through both insider conversations**
17  **and consumer-facing strategies** (in full disclosure, **the author's**
18  **firm Candide Group**, and its project Real Money Moves, **are**
19  **members of the committee**). … On February 14th, **Families**
20  **Belong Together coalition members** … put this ethos into action
21  with **protests at over 100 bank branches, and over 150,000**
22  **petition signatures asking Chase and Wells Fargo to break up**
23  **with private prisons—or pledging to break up with their banks**
24  **instead**. … **Clarification: This article does not intend to suggest**
25  **that CoreCivic or GEO Group housed children separated from**
26  **their parents pursuant to the Trump family separation policy.**
27  **CoreCivic has stated, "CoreCivic does not and has never housed**
28  **children separated from their parents pursuant to the Trump**

*family separation policy."* … *While the terminology of "family separation" tends to focus on the detention of children, I view the phenomena of family separation as more broad (for instance, inclusive of separating a grown adult from their aging parent, or spouse from spouse, or a parent being incarcerated while their child remains free, etc.). Family separation is thus practiced in the context of both immigration and mass incarceration, such that it is possible to participate in family separation without participating in the housing of children.*"

e. On October 10-11, 2019, Defendants published the following statements by revising their September 30, 2019 article on the Forbes.com platform: "*Given their business model depends on keeping a consistent and increasing number of people incarcerated, it's been speculated and critiqued that this is why GEO Group and CoreCivic have spent $25M lobbying over the past three decades.* Disclosures show they've lobbied on a number of bills related to funding for ICE enforcement over the years. Both GEO Group and CoreCivic say that they don't lobby on legislation or policies that would affect the basis for or length of incarceration or detention, but according to the Justice Policy Institute, both companies have served on task forces of the American Legislative Exchange Council (ALEC), which has written and promoted model legislation focused on mandatory minimums sentences [sic], three strikes laws, and "truth in sentencing legislation."

136.    Defendants' statements were intended to and did falsely convey that CoreCivic operates immigrant detention facilities for children separated from their parents at the border and that CoreCivic lobbies for harsher sentencing and immigration laws.

137.   Defendants' accusations and implications are reasonably understood to be statements of fact about CoreCivic, and were understood by people who read them to be statements of fact about CoreCivic.

138.   Defendants juxtaposed a series of statements so as to create a false implication.  CoreCivic does not and has never operated immigrant detention facilities for children separated from their parents at the border.  Those facilities are operated by the government or by other companies.  Under long-standing policy, CoreCivic does not lobby for harsher sentencing or immigration laws.

139.   Defendants' statements create an implication that is defamatory and libelous *per se*.  Defendants' falsehoods have exposed CoreCivic to hatred and contempt.  Indeed, Defendants have boasted about the success they have had in causing the public to shun and avoid the company and in driving up the cost of capital.  Defendants' statements were calculated to—and did in fact—provoke outrage and cause the company reputational and financial damage, to Defendants' financial benefit.

140.   Defendants had no applicable privilege or legal authorization to create these false and defamatory implications or, if they did, they abused it.

141.   As set forth above in detail, Defendants published these statements with actual malice, including by disregarding their first-hand knowledge, purposefully avoiding or intentionally disregarding numerous publicly available sources rebutting their false claims, purposefully avoiding contacting CoreCivic for comment before publication, and—when specifically put on notice of the truth and asked to retract—doubling down on and republishing their false accusations, all in furtherance of their plan to enrich themselves at CoreCivic's expense.  Upon information and belief, discovery will reveal additional evidence of Defendants' actual malice, including their financial motivation to divert capital from CoreCivic to the investment products from which they profit.

142.   Defendants juxtaposed these series of statements so as to imply a

defamatory connection between them or otherwise create a defamatory implication and they did this intentionally, willfully, maliciously, and in conscious disregard of CoreCivic's rights and reputation and of the truth.

143.     Defendants' defamatory falsehoods have been repeated and republished by numerous people, which was reasonably foreseeable to—and specifically intended and expected by—Defendants.

144.     As a direct and foreseeable result of Defendants' false and defamatory implications, CoreCivic has suffered financial and reputational harm.

145.     As a result of Defendants' false and defamatory implications, CoreCivic has been forced to make an expenditure of money to remedy the defamation.

146.     In view of the forgoing, CoreCivic is entitled to actual, assumed, punitive, and other damages in an amount to be specifically determined at trial.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter an award in Plaintiff's favor, and against Defendants, as follows:

(1)     awarding compensatory damages in an amount to be proven at trial;

(2)     awarding punitive damages in an amount to be determined at trial;

(3)     awarding a narrowly-tailored order enjoining Defendants from repeating their defamatory statements about CoreCivic;

(4)     awarding a narrowly-tailored injunction compelling Defendants to delete any posts adjudicated by this Court to be defamatory;

/ / /

/ / /

/ / /

/ / /

/ / /

1    (5)    awarding costs of the suit incurred herein; and

2    (6)    such other and further relief as the Court deems appropriate.

3

4    Dated:    March 4, 2020

5

6                                          By:  /s/ Michael B. McClellan

7                                          Michael B. McClellan, CBN 241570
                                           NEWMEYER & DILLION LLP
8                                          895 Dove Street, Fifth Floor
                                           Newport Beach, CA  92660
9                                          Telephone: (949) 854-7000
10                                         Email: Michael.McClellan@ndlf.com

11                                         Elizabeth M. Locke (*Pro Hac Vice*
12                                         Application Forthcoming), VA Bar
                                           No.71784
13                                         Megan L. Meier (*Pro Hac Vice* Application
14                                         Forthcoming), VA Bar No. 88720
                                           Shannon Timmann (*Pro Hac Vice*
15                                         Application Forthcoming), DC Bar No.
16                                         1614929
                                           CLARE LOCKE LLP
17                                         10 Prince Street
18                                         Alexandria, VA 22314
                                           Telephone: (202) 628-7400
19                                         Email:  libby@clarelocke.com
20                                         Email:  megan@clarelocke.com
                                           Email:   shannon@clarelocke.com
21
22                                         *Attorneys for Plaintiff CoreCivic, Inc.*

23

24

25

26

27

28